# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 12, 2014          Decided June 27, 2014

No. 08-1144

SIERRA CLUB AND LOUISIANA
ENVIRONMENTAL ACTION NETWORK,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN PETROLEUM INSTITUTE AND GASIFICATION
TECHNOLOGIES COUNCIL,
INTERVENORS

———

Consolidated with Nos. 08-1145, 12-1295

———

On Petitions for Review of Final Actions of the
United States Environmental Protection Agency

———

*Khushi K. Desai* argued the cause for petitioners. With
her on the briefs were *David R. Case* and *James S. Pew*.

*Norman L. Rave Jr.*, Attorney, U.S. Department of
Justice, argued the cause for respondent. With him on the
brief were *Robert G. Dreher*, Acting Assistant Attorney
General, and *Alan H. Carpien*, Attorney, U.S. Environmental

Protection Agency. *Cynthia J. Morris*, Attorney, U.S. Department of Justice, entered an appearance.

*Thomas Sayre Llewellyn* argued the cause for intervenors. With him on the brief were *Harry M. Ng* and *Deanne M. Ottaviano*. *Michael R. See* entered an appearance.

Before: HENDERSON and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In 2008, the Environmental Protection Agency promulgated a rule that exempts from regulation under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901 *et seq.*, certain hazardous residuals left over from the petroleum refining process. *See* 73 Fed. Reg. 57 (Jan. 2, 2008). That exemption, referred to as the Gasification Exclusion Rule, applies when those residual materials are inserted into gasification units to produce "synthesis gas," which is a type of fuel that may be burned for the recovery of energy.

Petitioners Sierra Club, Louisiana Environmental Action Network (Louisiana Network), and Environmental Technology Council petitioned this court for review of the Gasification Exclusion Rule, arguing that it violates RCRA's plain language requiring the regulation of hazardous wastes used as fuel, 42 U.S.C. § 6924(q), and that the Rule's promulgation violated the procedural and substantive requirements of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. We hold that the regulation violates the plain language of RCRA and, for that reason, is vacated.

3

**I**

***Statutory Framework***

The Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*, is the primary federal statute addressing the management of solid and hazardous waste. It prescribes a nationwide, "cradle-to-grave" regulatory framework governing the "safe treatment, storage and disposal of hazardous waste," *United Technologies Corp. v. EPA*, 821 F.2d 714, 716 (D.C. Cir. 1987), and charges the EPA with promulgating regulations setting the necessary standards to achieve those goals, 42 U.S.C. § 6922(a).

While the statute's definitional provisions can be technical and detailed, as relevant here, RCRA defines "hazardous waste" as "solid waste" that poses a danger to human or environmental health. 42 U.S.C. § 6903(5). "Solid waste," in turn, is defined as garbage, refuse, sludge, "and other discarded material." *Id.* § 6903(27).

In Section 6921, Congress mandated that the EPA promulgate regulations identifying the hazardous wastes that are subject to RCRA regulation, "taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics." 42 U.S.C. §§ 6921(a)-(b).

Initially, the EPA declined to regulate hazardous materials that were burned as fuel or used to produce fuel, reasoning that those uses as fuel meant the materials were not "discarded," and thus they were not regulable as waste. *See* 40 C.F.R. § 261.2(c)(2) (1983); *Horsehead Resource Dev. Co. v. Browner*, 16 F.3d 1246, 1253 (D.C. Cir. 1994) (citing 45

Fed. Reg. 33,084, 33,092-33,094, 33,120 (May 19, 1980));
*see also American Mining Congress v. EPA*, 824 F.2d 1177,
1189 (D.C. Cir. 1987) (*AMC I*).

To redress that "major deficiency" in the EPA's
administration of RCRA, S. Rep. No. 284, 98th Cong., 1st
Sess. 36 (1983); H.R. Rep. No. 198, 98th Cong., 1st Sess. 39
(1983), Congress amended the statute in 1984 to add Section
6924(q). That Section specifically addresses the regulation of
"Hazardous waste used as fuel." 42 U.S.C. § 6924(q).
Specifically, Section 6924(q) directs the EPA to establish
regulatory standards, as "necessary to protect human health
and the environment," to govern facilities that:

> (A) "produce a fuel" from "any hazardous waste
> identified or listed under section 6921 of this title,"
> whether alone or as a component combined with other
> materials;
> (B) "burn, for purposes of energy recovery" a fuel
> produced under subsection (A) or containing any other
> hazardous waste component in fuel that is listed under
> Section 6921; or
> (C) "distribute[] or market[] any fuel" produced under
> subsection (A) or containing any other hazardous waste
> component in fuel that is listed under Section 6921.

42 U.S.C. § 6924(q)(1). Congress added that, for purposes of
this subsection, "the term 'hazardous waste listed
under section 6921'" shall "include[] any commercial
chemical product" that "is listed under section 6921 of this
title" and that, "in lieu of its original intended use, is (i)
produced for use as (or as a component of) a fuel, (ii)
distributed for use as a fuel, or (iii) burned as a fuel." *Id*.

5

### *Regulatory Background*

Eleven years after Congress adopted Section 6924(q), the EPA proposed a rule that would exclude from RCRA regulation those petroleum refinery waste products that are reinserted into specified petroleum refining processes. *See* 60 Fed. Reg. 57,747 (Nov. 20, 1995). The EPA reasoned that such materials do not constitute "waste" because they are recycled as part of an ongoing petroleum production process, and thus are never "discarded" within the meaning of RCRA's definition of hazardous solid waste, 42 U.S.C. § 6903(5) & (27). *See* 60 Fed. Reg. at 57,752-57,754. Among the refinery processes the EPA sought to exclude were distillation, catalytic cracking, fractionation, and thermal cracking (also known as coking). *See id.* at 57,753.

Three weeks before the final version of that regulation was to be issued, the EPA published a Notice of Data Availability requesting comment on whether "gasification" should be added to the list of excluded processes. *See* 63 Fed. Reg. 38,139 (July 15, 1998). Gasification is a process that transforms oil-bearing, residual materials separated out by the petroleum refining process into a distinct form of fuel known as synthesis gas or "syngas," which can be used for energy recovery. *See* 63 Fed. Reg. at 38,141. Specifically, while syngas can be used to produce other chemicals, it can also be burned as a fuel to produce electricity or steam. *See id.*

When the EPA published the final rule three weeks later, however, gasification was not included as one of the exempt processes. *See* 63 Fed. Reg. 42,110, 42,184 (Aug. 6, 1998).

Four years later, the EPA revisited the matter and proposed a rule that would exclude from RCRA regulation residual oil-bearing materials left over from the petroleum

refining process that are destined for insertion into a gasification unit to produce synthesis gas. *See* 67 Fed. Reg. 13,684 (March 25, 2002). That proposal differed from the query in the 1998 Notice of Data Availability in that it proposed that those materials would be exempt whether or not the gasification unit was part of a petroleum refining operation. *Id.* at 13,690 (codified at 40 C.F.R. § 261.4(a)(12)(i)).

Also unlike the original 1998 Notice of Data Availability, the proposed Gasification Exclusion Rule conditioned the exemption from RCRA on compliance with a series of conditions on the syngas-creation process: (1) the system into which the material is inserted must meet the proposal's definition of a "gasification system;" (2) the gasification system must generate a synthesis gas that meets the specifications for synthesis gas fuel that the EPA would exempt from the definition of solid waste; (3) the residual waste materials generated from the gasification system must not be placed on the land if they exceed the applicable regulatory standards for chromium, lead, nickel, vanadium, arsenic, or antimony; and (4) the oil-bearing hazardous secondary materials employed to create syngas must not be placed on the land or speculatively accumulated prior to insertion into the gasification system. 67 Fed. Reg. at 13,690.

Petitioners Sierra Club and Environmental Technology Council, as well as other members of the public, submitted comments on the proposed rule that expressed substantial concern about the potential for environmental harm if gasification units were allowed to operate without RCRA regulation, and offered suggestions to expand or alter the EPA's proposed conditions. *See, e.g.*, Comments of the Environmental Technology Council, Docket No. EPA-HQ-RCRA-2002-002-0049 (Sept. 10, 2002); Comments of Sierra

Club Lone Star Chapter, Docket No. EPA-HQ-RCRA-2002-0002-0060 (Sept. 10, 2002). In particular, those comments voiced concern that the proposed exclusion, even with the proposed conditions, would fail to regulate hazardous air emissions produced by the gasification process adequately, and Sierra Club explained that the resulting environmental risks would disproportionately affect the low-income and minority neighborhoods where many refineries are located. *See id.*

When the rule was finalized on January 2, 2008, however, the EPA simply appended "gasification" to the list of refining processes wholly exempted from RCRA in 40 C.F.R. § 261.4(a)(12)(i), abandoning all of its originally proposed conditions, and rejecting those suggested by commenters. *See* 73 Fed. Reg. 57, 58 (Jan. 2, 2008). As a result, under the final Gasification Exclusion Rule, oil-bearing hazardous secondary materials that are otherwise hazardous wastes under Section 6921 of RCRA are exempted from RCRA regulation if they are eventually inserted into a gasification unit located at some petroleum refinery and used to produce synthesis gas. *See id.*

## II

As a preliminary matter, Industry-Intervenors argue that this court lacks subject matter jurisdiction over Petitioners' challenge to the Gasification Exclusion Rule. They contend that Petitioners lack standing, and that their petition to this court for review of the Rule was rendered untimely by their subsequent administrative petition to the EPA seeking the agency's reconsideration of the Rule. We hold that Petitioners Sierra Club and Louisiana Network both have standing and timely sought review, but that the Environmental

Technology Council's petition must be denied for failure to state a legal claim.

**A**

The requirement that a party invoking federal court jurisdiction establish standing is an essential, structural constraint on the power of Article III courts that enforces the Constitution's separation of powers. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013); *Susan B. Anthony List v. Driehaus,* No. 13-193, slip op. at 7 (U.S. June 16, 2014) ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.") (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013)). The "irreducible constitutional minimum" for standing is (i) the party must have suffered a concrete and particularized injury in fact, (ii) that was caused by or is fairly traceable to the actions of the defendant, and (iii) is capable of resolution and likely to be redressed by judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992).

When, as here, petitioners assert "representational standing" to bring suit on behalf of their members, they must demonstrate that at least one of their members would otherwise have standing to sue in his or her own right; that the interests they seek to protect are germane to their organizations' purposes; and that neither the claim asserted nor the relief requested requires the participation of individual members. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 181 (2000).

The EPA does not dispute Sierra Club's or Louisiana Network's standing at all. But Intervenors, the American Petroleum Institute and the Gasification Technologies Council, contend that Petitioners lack standing, arguing specifically that Petitioners have not been injured because they have not sufficiently identified a refinery near their members that, at the time of the petitions, was relying on the Gasification Exclusion Rule. That argument misunderstands both the law and the record.

When, as here, the party seeking judicial review challenges an agency's regulatory failure, the petitioner need not establish that, but for that misstep, the alleged harm certainly would have been averted. Rather, the petitioner need demonstrate only a "'substantial probability' that local conditions will be adversely affected, and thus will harm members of the petitioner organization." *American Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000); *see also Susan B. Anthony List*, No. 13-193, slip op. at 8 ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or if there is a 'substantial risk' that the harm will occur.") (quoting *Clapper*, 133 S. Ct. at 1150 n.5); *Sierra Club v. EPA*, No. 13-1014, slip op. at 11 (D.C. Cir. June 13, 2014) ("Because '[e]nvironmental and health injuries often are purely probabilistic,' the court has 'generally require[d] that petitioners claiming increased health risks to establish standing demonstrate a substantial probability that they will be injured[.]'") (quoting *Natural Resources Defense Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006)).[1]

---

[1] There is no dispute in this case that, if the asserted injuries are sufficient, the causation and redressability prongs of standing are satisfied. The EPA's exclusion of gasification from RCRA regulation is a direct cause of the asserted injuries, and a judicial order invalidating the rule would remediate that asserted injury.

The record in this case documents the very substantial and concrete risk of harm that some of Petitioners' members face. Petitioners' declarations identified four individuals who live or work in close proximity to three specific refineries— Frontier El Dorado Refining Company in El Dorado, Kansas, Motiva Enterprises in Delaware City, Delaware, and Exxon Mobil Corporation in Baytown, Texas. *See* Petitioners' Opening Br., Declarations Addendum 5-6 (declaration of Sierra Club member Lyle English); *id*. at 10-13 (Sierra Club and Louisiana Network member William Fontenot); *id*. at 17-22 (Sierra Club member Karla Land); *id*. at 26-29 (Sierra Club member Amy Roe). At the time the petition for review was filed in this court, each of those refineries already had a gasification unit in place, ready and able to process the very hazardous materials that are the subject of the challenged regulation. *See id.* The declarations further explained those individuals' particularized fears of serious health and environmental consequences from the gasification process, and their individual behavioral changes prompted by the toxic exposure that Petitioners aver the regulatory exemption will cause. *See id.*

In addition, the EPA itself, in assessing the costs and benefits of its Rule, identified by name those same three refineries as expected to take advantage of the Gasification Exclusion Rule, and detailed the over 100,000 tons of oil-bearing hazardous secondary material those three refineries alone could process in a given year. *See* 73 Fed. Reg. at 68-69; EPA Assessment of the Potential Costs, Benefits, and Other Impacts of the Exclusion for Gasification of Petroleum Oil-bearing Secondary Materials—Final Rule at 12 (2007), Docket No. RCRA-2002-0002-0089. Chevron Texaco confirmed that assessment, explaining in its comments on the Rule that "[t]here are currently over 70 Chevron Texaco

owned or licensed gasifiers operating or under construction around the world," including "the gasifier at Frontier Oil's refinery in El Dorado, Kansas (refinery once owned by Texaco). That gasifier has been operating 6 years now." Comments of Chevron Texaco, Docket No. RCRA-2002-0002-0058 (Sept. 10, 2002).

Intervenors American Petroleum Institute and the Gasification Technologies Council invoke this Court's decision in *American Petroleum Institute v. EPA*, *supra*, which found no standing to challenge a different RCRA exemption. The differences in the factual records of the two cases, however, actually underscore Sierra Club's and Louisiana Network's standing here. The *American Petroleum* petitioners lacked standing to challenge the EPA's exemption of the petroleum coking process from RCRA because those organizations put nothing at all in the record sufficient to demonstrate a substantial probability that their affiants would be exposed to hazardous materials as a result of the exemption. *See* 216 F.3d at 67-68 ("[N]othing is averred to the effect that * * * hazardous waste quenching currently exists or is substantially likely to exist in those facilities generating coke product to which members of environmental petitioners' organizations are exposed."); *see also Sierra Club*, No. 13-104, slip op. at 11 (finding that environmental petitioners failed to demonstrate standing because they offered "no evidence" and made "no attempt" to tie the EPA's actions to a substantial probability that their members would suffer diminished air quality). Here, by contrast, the declarants have identified with specificity the substantial risks they face from neighboring refineries' existing gasification systems and the adverse effects of the Gasification Exclusion Rule on their everyday behavior. And the record reconfirms the industry's commitment to undertaking the gasification process authorized by the challenged Rule.

The Institute and Council nevertheless characterize Petitioners' concern that refineries will use the Exclusion that they specifically sought from the EPA as "a matter of speculation" insufficient to establish standing. Intervenors' Br. 12. But once the EPA promulgated the Gasification Exclusion Rule, it was "a hardly-speculative exercise in naked capitalism" to predict that facilities with existing gasification units on site would take advantage of the Exclusion for which they lobbied. *See American Trucking Ass'n v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013) (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006)); *see also Natural Resources Defense Council v. EPA*, No. 98-1379, slip op. at 11-12 (D.C. Cir. June 27, 2013).

Moreover, the Institute and Council surely cannot believe their own argument. When intervening in this litigation, they established Article III standing for themselves by confirming that their members "would" be injured should the Rule be vacated by this court because they would be deprived of the affirmatively desired opportunity to burn oil-bearing secondary hazardous waste in their gasification systems free of RCRA regulation. Intervenors' Br. 19. Similarly, in the Institute's comments on the 1998 Notice of Data Availability, it stated that "many of [the Institute]'s members own and operate petroleum refineries that generate oil-bearing secondary materials that *are*, or can be, reused at a refinery in production processes such as gasification. * * * Thus, [the Institute] has a strong interest in the subject matter of the [Notice of Data Availability] on whether the * * * exclusion should apply to refining industry oil-bearing secondary materials inserted into gasification units." Comments of the American Petroleum Institute, Docket No. F-98-PR2A-FFFFF (Oct. 13, 1998) (emphasis added).

When EPA solicited comments on the Gasification Exclusion Rule again in 2002, the Institute reiterated its 1998 comments, and re-emphasized its stake in the rulemaking, explaining that "several of [its] members *already employ* gasification technology at their refineries." Comments of the American Petroleum Institute, Docket No. F-2002-RPRP-FFFF (Sept. 10, 2002) (emphasis added).

Furthermore, in its motion to intervene in this Court, the Institute asserted that it "has a very substantial interest in the outcome of this case" because several of [the Institute]'s members "*employ* the gasification process at issue here." American Petroleum Institute Motion to Intervene, Docket No. 1114593, at 3 (April 30, 2008) (emphasis added). In addition, the motion emphasized that a "remand or setting aside of the challenged regulation could therefore operate to the economic detriment of [the Institute]'s members." *Id.* The Intervenors' comments and intervention papers thus highlight the present-tense reality of their gasification activities and abilities; their "very substantial interest" in employing the process exempted by the Gasification Exclusion Rule, *id.*; and correspondingly, the substantial present-tense threat posed to their petitioning neighbors.

Standing, in other words, is not a game of heads the industry intervenors win; tails petitioners lose. The "opportunity injury" that the Institute and Council assert means that they are "able and ready," both technologically and programmatically, to exercise the opportunity that the regulation affords them. *See Northeastern Florida Chapter of the Ass'n of General Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1016 (D.C. Cir. 1997). The very opportunity that the Institute and Council seek is the same

opportunity that Petitioners attest poses a substantial threat to their health and living environment. Petitioners, for their part, need not wait to bring suit until they can actually detect the toxic contaminants exuding.[2]

**B**

Petitioner Environmental Technology Council filed its own separate petition in this court, No. 08-1145, challenging the Gasification Exclusion Rule on the same substantive grounds as those articulated in the petitions filed by Sierra Club and Louisiana Network, Nos. 08-1144, 12-1295. This court has repeatedly held, however, that the Council lacks prudential standing under RCRA to litigate "either directly or as a proxy for the environmental interests of the public for whose protection the Act was presumably passed." *Sierra Club v. EPA*, 292 F.3d 895, 902-903 (D.C. Cir. 2002) (Environmental Technology Council lacks "prudential standing" under RCRA because it is a self-proclaimed "national trade association of commercial firms that provide technologies and services for recycling, treatment, and secure disposal of industrial and hazardous wastes," whose only interest in RCRA regulation is to promote "ever more stringent regulation 'to improve the business opportunities of treatment firms'—an end we have consistently and repeatedly held lies outside the 'zone of interests' protected by RCRA.") (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925-926 (D.C. Cir. 1989)); *accord Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 871 (D.C. Cir. 2001).

---

[2] Because Petitioners have established standing based on the asserted injuries that arise from their exposure to the gasification process, we need not address their claims of informational and procedural injury.

The Supreme Court has recently clarified that "'prudential standing' is a misnomer," and that the "zone of interests" inquiry is in fact a question of whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue," not a question of standing. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-1388 (2014). But whether characterized as prudential standing or legal capacity to state a claim under RCRA, the Environmental Technology Council has failed in this case to make any showing in the briefs or record that it has a legally cognizable interest in this litigation. *See Sierra Club*, 292 F.3d at 903.

To be sure, had the Council joined a single petition with the Sierra Club or Louisiana Network, then our determination that at least one of the joint petitioners had standing and a legally cognizable claim would have averted this question. *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009). But because the Council initiated its own independent petition for review, creating its own distinct case in this court, the Council has no co-parties to its suit who could establish standing or could assert a legally cognizable claim for relief. While the Council's petition was later consolidated with those of the Sierra Club and Louisiana Network, the mere clerical act of consolidating multiple petitions for efficient review does not obviate the need for each petition on which a judgment issues to independently establish standing or (after *Lexmark*) its legal capacity to prosecute the action.

We therefore hold that the Environmental Technology Council lacks a "legislatively conferred cause of action" that encompasses its RCRA claims, *Lexmark*, 134 S. Ct. at 1382, and we accordingly deny its petition, No. 08-1145.

## C

The Institute and Council also argue that this court lacks jurisdiction because Sierra Club and Louisiana Network petitioned the EPA for administrative review of the Gasification Exclusion Rule in the form of a "Petition for Reconsideration," rather than in a "Petition for New Rulemaking." In their view, that titling rendered the Rule non-final and thus non-appealable.

That is not correct. Regardless of how they captioned their administrative petition, Sierra Club and Louisiana Network explicitly sought the EPA's substantive review of a final rule, for which the only remedy was a new rulemaking. Indeed, one of Petitioners' primary objections to the Gasification Exclusion Rule was that its promulgation did not comply with the APA's notice and comment rulemaking requirements. That is a fault that could only be repaired with a new rulemaking and new opportunity for public comment. *See* Petition for Reconsideration at 5-8 ("Because EPA relied on the 'original proposal suggested in the July 15, 1998' NODA and not on the 2002 proposed rule to formulate the Hazardous Waste Gasification Rule, the final rule was not a logical outgrowth of the proposed rule and the public was denied the opportunity for notice and comment in several critical areas."); *see generally American Mining Congress v. EPA*, 907 F.2d 1179, 1185 (D.C. Cir. 1990) (holding that a petition for "administrative reexamination" was, despite its label, a petition for new rulemaking, where the record of the case made clear that was how the EPA would have treated the petition).

Furthermore, a petitioner's stylistic mislabeling could not singlehandedly revert the EPA's final Gasification Exclusion Rule to a non-final proposal—the type of tentative agency judgment that could have been amended without proceeding through new notice and comment rulemaking. *See Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 919 (D.C. Cir. 1998) ("Once a rule is final, an agency can amend it only through a new rulemaking."). We thus hold that the administrative petition here was a request for new rulemaking, which does not "pose any problem for our subject matter jurisdiction." *Id.* Sierra Club and Louisiana Network timely filed their 2008 petition for review of the final Gasification Exclusion Rule, No. 08-1144, and we therefore have jurisdiction over both that petition and their timely 2012 petition for review of EPA's denial of their administrative petition for reconsideration, No. 12-1295.

## III

Turning, at long last, to the merits, the question in this case is whether the Gasification Exclusion Rule violates the statutory mandate in Section 6924(q) of RCRA that the EPA regulate "[h]azardous waste used as fuel." 42 U.S.C. § 6924(q). Because Congress has charged the EPA with enforcing RCRA, 42 U.S.C. § 6934(e), we review that rule under the familiar, two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). First, we determine whether Congress has directly spoken to the precise question at issue. *Id.* at 842-843. If it has, "that is the end of the matter," and we must give effect to the "unambiguously expressed intent of Congress." *Id.* If, on the other hand, the statute is silent or ambiguous with respect to the specific issue, we deferentially review the agency's reading of the statute to determine whether it is reasonable. *Id.* at 843. In this case, as in *Natural Resources Defense*

*Council v. EPA*, No. 98-1379, *supra*, our analysis begins and ends at *Chevron*'s first step.

Section 6924(q) is direct and unqualified in its compass. The EPA "shall" regulate facilities that "produce a fuel [] from any hazardous waste identified or listed under section 6921," burn such a fuel, or distribute or market such a fuel. 42 U.S.C. § 6924(q)(1). To drive the provision's comprehensiveness home, Congress not once, not twice, but *eleven* times employed the all-embracing adjective "any" to describe when hazardous wastes used as a fuel are covered. *See id.* "[Ten] 'any's' in one sentence" and an eleventh a few lines later, "and it begins to seem that Congress meant the statute to have expansive reach." *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 7 (2008).

There is, moreover, no serious question that the Gasification Exclusion Rule exempts from RCRA hazardous materials that are "listed under section 6921." 42 U.S.C. § 6924(q)(1). The "oil-bearing hazardous secondary materials" at issue here are identified as hazardous materials in the regulations the EPA adopted implementing Section 6921. *See* 73 Fed. Reg. at 58; 40 C.F.R. §§ 261.31-261.33. But for their use in the production of syngas fuel, they would unquestionably be regulated as hazardous waste under Section 6921. Indeed, it is precisely their usage to "produce a fuel" that puts the materials squarely within Section 6924(q)'s grasp. 42 U.S.C. § 6924(q)(1)(A).

The EPA's efforts to extricate its Rule from that plain text all fail. *First*, the EPA argues that the hazardous materials can be liberated from RCRA's regulatory mandate on the ground that their use to make the fuel syngas means they are not hazardous "waste," because they are not discarded within the meaning of RCRA's definition of "solid

waste," 42 U.S.C. § 6903(27). That reading would stand Section 6924(q) on its head. By its plain terms, that Section applies to hazardous waste precisely because it is used to "produce a fuel." 42 U.S.C. § 6924(q)(1)(A). The materials' use in the production of fuel thus cannot simultaneously put them within and without RCRA.

*Second*, the EPA argues that its exception is confined to the creation of syngas fuel as part of an ongoing production process. The problem with that argument is that Congress wrote no such qualification into Section 6924(q); the provision's eleven "any's," in fact, defy such limitation. *See National Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1128 (D.C. Cir. 2013) ("The word 'any' is usually understood to be all inclusive, and EPA presented no compelling reason why 'any' should not mean 'any.'") (quotation marks and citation omitted); *see also Natural Resources Defense Council v. EPA*, No. 98-1379, slip op. at 15 ("From the statute's mandatory and inclusive language we can only conclude the Congress intended to require that EPA regulate the production, burning for energy recovery and distributing/marketing of *all* such fuels derived from *all* listed hazardous wastes—with the sole express exclusions of (1) certain oil-containing petroleum refinery wastes that are converted into petroleum coke and (2) certain oil-containing petroleum refinery wastes and facilities that burn only de minimis quantities of hazardous waste, *see* 42 U.S.C.§ 6924(q)(2)(A)-(B).").

*Third*, the EPA's reasoning forgets that Congress enacted Section 6924(q) specifically to overturn the EPA's exclusion from regulation of those very same materials under that very same rationale. *See, e.g.*, S. Rep. No. 284, *supra*, at 37 (1983) (clarifying that the amendment applies to "hazardous waste-derived fuels, fuels blended with hazardous wastes, and

hazardous wastes burned without being blended as fuels," and that EPA may no longer interpret such materials as non-"wastes"); H.R. Rep. No. 198, *supra*, at 39 (1983) ("Section [6924(q)] corrects a major deficiency in the present RCRA regulations by requiring EPA to exercise its existing authority over hazardous waste-derived fuels by regulating their *production*, distribution and use. * * * The Committee wants to assure that EPA will exercise its authority over all facilities that blend or burn hazardous waste for energy recovery.") (emphasis added).

*Fourth*, the EPA contends that this court's decision in *AMC I*, 824 F.2d 1177, requires the categorical exclusion of materials that are reused within ongoing production processes because they are not discarded as "solid waste." In its view, *AMC I* forbids the EPA to regulate facilities producing syngas from hazardous materials through the gasification process, since those materials too are not discarded, and thus are not "solid waste."

That argument overreads *AMC I*. *AMC I* involved not Section 6924(q), but RCRA's general definitional section pertaining to "solid waste," 42 U.S.C. § 6903(27), and the EPA's undifferentiated subjection to RCRA regulation of a broad variety of materials that are reused or recycled as part of ongoing petroleum refining processes.

In rejecting that categorical expansion of RCRA, the *AMC I* court went out of its way to separate out from its ruling the "specific problem" of hazardous wastes "used as fuel," which would subject them to Section 6924(q). 824 F.2d at 1189. Hazardous residuals used as fuel, the court explained, were different because Congress statutorily deemed such materials to be "discarded" and therefore within the statutory definition of "solid waste." *Id*. (citing H.R. Rep.

No. 198, *supra*, at 40 (1983)). "For the purpose of interpreting section 6924(q)," then, the term "discarded" is not an ambiguous term, and "EPA therefore has no discretion to 'reasonably' construe the term to exclude hazardous-waste-derived fuels from regulation." *Natural Resources Defense Council v. EPA*, No. 98-1379, slip op. at 16.

In other words, "*AMC I* involved an altogether different facet of waste disposal governed by a different statutory section—*i.e.*, the scope of the RCRA term 'solid waste'"— and not the EPA's right and responsibility under Section 6924(q) to regulate facilities producing fuels from materials that are unquestionably "hazardous waste" otherwise subject to RCRA. *Horsehead*, 16 F.3d at 1263.

Indeed, as we explain today in *Natural Resources Defense Council v. EPA*, No. 98-1379, while *AMC I* focused only on Congress's concern with the burning of commercial chemicals as fuels when it passed Section 6924(q), that Section's compass is "far broader than that." *See* slip op. at 16 n. 7. In amending the statute by adding this provision, Congress made clear that "[h]azardous waste, as used in this provision [6924(q)] *includes not only wastes identified or listed as hazardous under EPA's regulations*, but also includes any commercial chemical product (and related materials) listed pursuant to 40 C.F.R. § 261.33, which is not used for its original intended purpose but instead is burned or processed as a fuel." *Id.*

In addition, *AMC I* involved the reuse or recycling of materials that are "reinsert[ed] into the refining process along with the normal crude feedstock." *AMC I*, 824 F.2d at 1180. Syngas, by contrast, is produced by taking certain secondary materials left over from the petroleum refining process and putting them *not* back into the normal refining process, but

into a gasification system. That distinct fuel production process falls squarely within Section 6924(q)'s plain text.

Accordingly, just as we concluded in *Natural Resources Defense Council v. EPA*, No. 98-1379, we hold here that Congress meant in Section 6924(q) what it said. *See* slip op. at 14-17. The EPA cannot carve out of RCRA one of the very activities that Congress commanded it to regulate. Section 6924(q)'s plain text deprives the EPA of the authority to remove oil-bearing secondary hazardous wastes from RCRA's reach when, through gasification, those materials are used to produce a fuel.[3]

\* \* \* \* \*

In closing, we note that Section 6924(q) does not, by its terms, require the EPA to subject all hazardous wastes used to produce a fuel to the full panoply of RCRA regulation. Instead, Congress directed the EPA to promulgate those standards that the EPA reasonably determines "may be necessary to protect human health and the environment." 42 U.S.C. § 6924(q). The EPA thus retains the ability to regulate such wastes in a manner that promotes goals like efficient resource recovery and reuse as long as it also comports with Congress's protective command. The Gasification Exclusion Rule's wholesale exemption of hazardous wastes used as fuel, however, does not fit that bill. We accordingly hold that Petitioners Sierra Club and Louisiana Network have standing; their petitions for review were timely; and the Gasification

---

[3] Because we grant the Sierra Club and Louisiana Network petitions on the ground that the regulation conflicts with the plain statutory text, we need not address the Petitioners' alternative argument that EPA failed to provide adequate notice of the final rule, as required by 5 U.S.C. § 553.

Exclusion Rule violates the plain statutory text of 42 U.S.C. § 6924(q).

For the foregoing reasons, we deny the petition for review in No. 08-1145 and grant the petitions for review in Nos. 08-1144 and 12-1295. The Gasification Exclusion Rule is vacated.

*So ordered.*