# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 22, 2021     Decided December 28, 2021
Reissued January 14, 2022

No. 20-1443

CHARLES ERWIN,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order
of the Federal Aviation Administration

*Joshua D. Burns* argued the cause for petitioner. On the briefs was *D. Michael McBride III.*

*Casey E. Gardner*, Attorney, Federal Aviation Administration, argued the cause and filed the brief for respondent.

Before: HENDERSON, TATEL and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: When Charles Erwin, a commercial airline pilot with a diagnosed

alcohol dependence, tested positive for alcohol, the Federal Aviation Administration (FAA) withdrew his medical certification required for flight. Erwin, whose test came less than a day after consuming food prepared in beer, requested reconsideration of the FAA's decision with documentation to demonstrate that the positive test was due to unknowing exposure to alcohol. Standing firm, the FAA issued a short order denying Erwin's request but failing to explain adequately its denial. Accordingly, we remand to the FAA for a more complete explanation of its decision. *See Friedman v. FAA*, 841 F.3d 537, 544–45 (D.C. Cir. 2016) (*Friedman I*).

## I. Background

## A. Statutory and Regulatory Background

The Congress has directed the FAA to "promote safe flight of civil aircraft" by promulgating regulations, including those "necessary for safety in air commerce." 49 U.S.C. § 44701(a), (a)(5). Overseeing pilot certification is an important part of the FAA's safety mandate. *See id.* § 44702. The FAA fulfills its safety mandate by requiring that, in addition to a pilot certificate, *see id.* § 44703(a), a commercial pilot hold a medical certificate issued under 14 C.F.R. part 67, 14 C.F.R. § 61.3(c)(1). The requirements for medical-certificate eligibility vary based on the class of certificate sought. 14 C.F.R. §§ 61.23(a), 67.101–.115 (first-class certificate), 67.201–.215 (second-class certificate), 67.301–.315 (third-class certificate). A commercial airline pilot may exercise certain privileges—for example, pilot-in-command privileges—only if he holds a first-class medical certificate. *Id.* § 61.23(a)(1). For a first-class certificate, a pilot must meet a host of medical standards, including, *inter alia*, vision, physical, mental and cardiovascular standards. *See id.* §§ 67.101–.115. If a pilot meets all of the medical standards,

he "is entitled to" an unrestricted medical certificate. *Id*. § 67.3. To meet the mental standards for an unrestricted medical certificate, a commercial airline pilot must not have an "established medical history or clinical diagnosis of . . . [s]ubstance dependence." *Id.* § 67.107(a)(4). A codified exception to this prohibition allows a pilot with a diagnosed substance dependence to be eligible for an unrestricted medical certificate if "there is established clinical evidence, satisfactory to the Federal Air Surgeon, of recovery, including sustained total abstinence from the substance(s) for not less than the preceding 2 years."[1] *Id*.

If a pilot with a diagnosed substance dependence fails to meet the "clinical evidence" test, the pilot must operate under a "Special Issuance of a Medical Certificate" (special issuance authorization). *Id.* § 67.401(a). The Federal Air Surgeon has discretion to grant a special issuance authorization and may do so if the pilot shows "to the satisfaction of the Federal Air Surgeon" that he can perform his duties "without endangering public safety during the period in which the [a]uthorization would be in force." *Id.* The Federal Air Surgeon may "[c]ondition the granting of a new [a]uthorization on the results of subsequent medical tests, examinations, or evaluations," *id.* § 67.401(d)(2), and may "[l]imit the duration of an [a]uthorization*,*" *id* § 67.401(d)(1). When the authorization expires, the pilot must "again show to the satisfaction of the Federal Air Surgeon" that he can perform his duties "without

---

[1]    The FAA Administrator has delegated the authority to "[i]ssue, renew, and deny medical certificates" and special issuance authorizations to the Federal Air Surgeon. 14 C.F.R. § 67.407(a). The Federal Air Surgeon heads the FAA's Office of Aerospace Medicine, whose mission is to "[e]nhance aerospace safety through aeromedical standards, certification, surveillance, education and research." Office of Aerospace Medicine Organization, FAA Order 1100.3K , ch. 1, ¶ 7 (Nov. 1, 2018); *see also id.* at 11 (Figure 2-1).

endangering public safety during the period in which the [a]uthorization would be in force." *Id.* § 67.401(a).

While a pilot holds a special issuance authorization, the Federal Air Surgeon retains discretion to withdraw it, *see id.* § 67.401(f), and may exercise that discretion if, *inter alia*, "[t]here is [an] adverse change in the holder's medical condition," or "[t]he holder fails to comply with a statement of functional limitations or operational limitations issued as a condition of certification," *id.* § 67.401(f)(1), (2). Within sixty days after service of the withdrawal letter, the pilot may request reconsideration by the Federal Air Surgeon and may file "supporting medical evidence" with the request. *Id.* § 67.401(i)(2). The Federal Air Surgeon's decision on the reconsideration request is a final agency order and issues within 60 days of the request. *Id.* § 67.401(i)(3).

The airlines and the FAA have developed a cooperative program, the Human Intervention and Motivation Study (HIMS) program, to "coordinate[] the identification, treatment and return to" the cockpit of a pilot with a substance dependence.[2] Participation in the HIMS program is often a condition of a special issuance authorization. A HIMS Aviation Medical Examiner (HIMS AME) is trained to oversee pilots who operate under special issuance authorizations and follows strict FAA reporting requirements. *See* FAA, *Guide for Aviation Medical Examiners* 421–29 (2021) (*AME Guide*). In September 2020, the FAA accepted NTSB Safety Recommendation A-07-43 and created the HIMS Step Down Plan (Plan).[3] Memorandum from Penny M. Giovanetti, D.O.

---

[2] *About HIMS*, Human Intervention Motivational Study, https://himsprogram.com/about-hims/.

[3] Documents related to the HIMS Step Down Plan are located on the HIMS program website: https://himsprogram.com/documents/.

Director, Med. Specialties Div., AAM-200 to AAM-200, AMCD, Reg'l Flight Surgeons 1 (Sept. 8, 2020) (hereinafter HIMS Step Down Plan Memorandum). The Plan creates tiers through which a pilot progresses based on his recovery, effective on the date the FAA issues the special issuance authorization. *See AME Guide* at 447. The FAA, not the pilot's HIMS AME, retains the final authority on when a pilot progresses through the tiers. *Id.* at 448. As he progresses, the pilot is subject to less onerous monitoring requirements. *Id.*; *infra* at 10–11. For example, by moving from the "Advanced Phase-3" to the "Maintenance Phase-4," the pilot no longer must attend a weekly peer addiction support group or undergo random alcohol or drug testing. *AME Guide* at 447.

## B. Factual and Procedural History

Charles Erwin (Erwin) is a commercial airline pilot who began his flying career over a decade ago, operating under an unrestricted first-class medical certificate. ████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Upon completion of an inpatient treatment program, Erwin entered the HIMS program to obtain a special issuance authorization because his substance dependence diagnosis and insufficient clinical evidence of the required two-year abstinence disqualified him from operating under an unrestricted medical certificate. Based on his treatment records, his post-treatment psychological and psychiatric testing conducted in March 2017 and the recommendations of both his HIMS AME and an FAA psychiatric consultant, Dr. Alan Sager, the FAA granted Erwin his first special issuance authorization (Authorization) on May 17, 2017. Unsealed Joint Appendix (J.A.) 68–71. The Authorization contained monitoring conditions, including random alcohol testing at least fourteen times per year,

biannual evaluations by Erwin's HIMS AME, annual psychiatric evaluations, aftercare counseling and reporting requirements. J.A. 70. Crucially, the Authorization was "contingent upon total abstinence from alcohol." J.A. 69 (emphasis omitted). It was scheduled to expire on May 31, 2020.

On December 13, 2017, Erwin ate a lunch of pulled pork at a Franklin, Tennessee restaurant. The menu did not note that the pork was prepared in beer. Erwin took some of the meal home and ate the leftovers that night. The next morning, Erwin submitted to a random alcohol test. Quest Diagnostic Incorporated Forensic Toxicology tested Erwin's urine for ethyl glucuronide (EtG) and ethyl sulfate (EtS) biomarkers and the test determined that Erwin's EtG level was 144 ng/mL and his EtS level was 157 ng/mL—both over the threshold set by Delta. On December 28, 2017, one day after learning of the positive test, Erwin voluntarily took additional tests, specifically tests for phosphatidyl ethanol (PEth) in his blood and EtG in his hair and nails. Those tests came back negative.

Once the FAA learned of the positive test, it withdrew Erwin's Authorization on January 9, 2018. Delta then gave Erwin two options: (1) sign a "last chance contract" and enter treatment again or (2) face termination. Erwin once again entered inpatient treatment and signed the new employment contract, continuing to insist that he had maintained his sobriety since November 21, 2016.

On March 9, 2018, pursuant to 14 C.F.R. § 67.401(i), Erwin requested the Federal Air Surgeon to review the withdrawal, maintaining that he had tested positive due only to inadvertently consuming food cooked in beer. With his reconsideration request, Erwin submitted numerous exhibits and a report from a forensic toxicologist, Dr. Thomas Kupiec,

to support his claim. The exhibits included, *inter alia*, evidence that Erwin ordered pulled pork at the restaurant, J.A. 191–92; an email from the restaurant stating that Erwin's dish was, "in fact, cooked with beer," even though the menu did not mention the beer, J.A. 193–94; the negative results of Erwin's follow-up tests from late December 2017, Sealed Joint Appendix (S.A.) 224–26; a 2012 Substance Abuse and Mental Health Services Administration (SAMHSA) Advisory on biomarkers, J.A. 202–09; a 2005 Memo from the Alabama State Board of Medical Examiners cautioning against using solely a positive urine EtG test to take disciplinary action against an employee, J.A. 220–21; and a study recommending use of PEth tests after a positive EtS or EtG test, J.A. 227–31. Kupiec's report discussed the drawbacks of using EtS/EtG tests to differentiate inadvertent exposure to alcohol and intentional alcohol use, concluding "within a reasonable degree of scientific certainty[] that the result of Mr. Erwin's urine analysis does not represent conclusive evidence of intentional alcohol consumption." The FAA requested additional documentation, which Erwin provided. In addition to the original documentation, Erwin provided treatment records from his second inpatient program and a new evaluation from his HIMS psychiatrist, Dr. Steven Lynn.

The FAA did not take action on his reconsideration request within the sixty-day time frame, 14 C.F.R. § 67.401(i)(3); instead, it reviewed Erwin's documentation. It forwarded Erwin's records to Dr. Sager, the same consultant who reviewed Erwin's records before the 2017 Authorization issued, asking Sager to prepare a memorandum recommending how to proceed. Sager recommended recertification for five years with continued monitoring, random tests, aftercare counseling and annual psychiatric evaluations. On January 31, 2019, the FAA issued Erwin a new special issuance authorization (Second Authorization), accepting Sager's

recommendations. Erwin is currently operating under the Second Authorization, which expires on January 31, 2024.

Although the FAA believed it had resolved Erwin's request, Erwin petitioned for a writ of mandamus in the U.S. District Court for the Western District of Oklahoma to compel the FAA to decide his reconsideration request. *See Erwin v. FAA, et al.*, Case No. CIV-20-661-D (W.D. Okla. Oct. 14, 2020). That action was dismissed after the Federal Air Surgeon issued a decision (Final Order). J.A. 303–04. The two-page Final Order explained that the Federal Air Surgeon "ha[d] reviewed [Erwin's] agency medical file and the additional documentation [he] ha[d] submitted in support of [his] request for review of the withdrawal of [the] Authorization" and concluded that "the additional information and documentation is not sufficient to reverse" the withdrawal and "affirm[ed] the withdrawal of [the] Authorization." J.A. 303. The Federal Air Surgeon noted that the positive alcohol test was an "adverse change" in Erwin's medical condition, demonstrated that Erwin did not maintain "total[] abstinen[ce]" and necessitated "a new evaluation of [his] current medical condition" in the interest of "public safety." *Id.* (citing 14 C.F.R. § 67.401(f)). Erwin timely petitioned for review, claiming the Final Order was arbitrary and capricious under § 706(2)(A) of the Administrative Procedure Act (APA). 5 U.S.C. § 706(2)(A).

## II. Analysis

### A. Standing

"Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, a showing of standing 'is an essential and unchanging' predicate to any exercise of our jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (1996) (en banc) (internal citation omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

(1992)). To demonstrate the "irreducible constitutional minimum of standing," *Lujan*, 504 U.S. at 560, the petitioner must show "(1) a personal injury-in-fact that is (2) fairly traceable to the defendant's conduct and (3) redressable by the relief requested," *Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1134 (D.C. Cir. 2005) (quoting *Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1240 (D.C. Cir. 2005)). The petitioner's standing burden is "the same as that of a plaintiff moving for summary judgment in the district court: it must support each element of its claim to standing 'by affidavit or other evidence.'" *Sierra Club v. EPA,* 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Lujan,* 504 U.S. at 561). The alleged injury-in-fact must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal quotation marks omitted), and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision," *id.* at 561 (internal quotation marks and citations omitted).

Erwin's case is unusual because his original Authorization would have expired on May 31, 2020, and he is currently operating under a Second Authorization that, on its face, imposes the same monitoring requirements as the original, albeit with a longer duration. *Compare* J.A. 68 (establishing duration of Authorization as thirty-six months), *with* J.A. 276 (establishing duration of Second Authorization as sixty months). Accordingly, the FAA argues that even if we vacate its Final Order, Erwin cannot demonstrate an injury because he will "continue to be subject to an [a]uthorization with monitoring requirements—regardless of the expiration date stated on his Authorization—unless and until he meets the medical standards for an *unrestricted* certificate in [14 C.F.R.] part 67." Resp't Br. 40–41 (emphasis in original).

To support his standing, Erwin asserts several injuries: additional monitoring requirements based on the Second Authorization, the lost opportunity to obtain an unrestricted medical certificate, damage to his reputation and Delta's "last chance contract" with its demanding termination provisions. Because the first asserted injury is sufficient to establish standing, we "need not address" the final three. *See Sierra Club v. EPA*, 755 F.3d 968, 976 n.2 (D.C. Cir. 2014).

Erwin has a cognizable injury arising from his poorer position in the HIMS Step Down Plan, and the accompanying extended monitoring, which we can likely redress by remanding the Final Order. *See Lujan*, 504 U.S. at 560–61. Erwin alludes to the Plan by referencing its genesis: NTSB Safety Recommendation A-07-43. Although neither Erwin nor the FAA elaborates on the Plan, the FAA has apparently begun applying the Plan through guidance to pilots with special issuance authorizations. *See AME Guide* at 446–48. Under the Plan, pilots progress through tiers based on the number of years they have flown under a given special issuance authorization. *See* HIMS Step Down Plan Memorandum at 1. As they progress, the pilots "step down" in tiers and receive less monitoring as a result. *See AME Guide* at 447. The tiers are based on an "uncomplicated progression of recovery," which includes compliance with the special issuance authorization, the pilot's individual evaluation by HIMS professionals and FAA review. *Id.*

As a pilot currently under special issuance authorization, Erwin is subject to the Plan. His Authorization issued on May 31, 2017, but the FAA withdrew the Authorization and required Erwin to obtain the Second Authorization, which he has operated under since January 31, 2019. Erwin therefore is about two years further behind in his progression through the Plan than he would be but for the Final Order. Translated into

tiers, the two-year gap puts Erwin in "Early Phase-2" rather than "Advanced Phase-3" and he will now not progress to Advanced Phase-3 until 2024. *See AME Guide* at 447. In Early Phase-2, he must undergo monthly peer-pilot and chief-pilot assessments that he would not have faced under the Authorization. *See id.* (demonstrating progression through tiers); J.A. 278 (detailing that Erwin must provide reports from his chief pilot and a peer pilot).

By remanding the Final Order for "further proceedings,"[4] it is "likely, as opposed to merely speculative," *see Lujan*, 504 U.S. at 561, that we can redress Erwin's lack of progression because his FAA medical file would include the remand, thus suggesting an "uncomplicated progression of recovery," *AME Guide* at 447.[5] The FAA suggests that Erwin will "continue to be subject to an [a]uthorization with monitoring requirements." Resp't Br. 40. But even if the FAA is correct—and it may not be—its position ignores the effects of the Plan. Erwin "need not prove that granting the requested relief is certain to redress [his] injury, especially where some uncertainty is inevitable." *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 117–18 (D.C. Cir. 1990). Having provided evidence of his continued "uncomplicated progression of recovery," *see supra* at 6–7, with only the positive test to the contrary, Erwin has provided sufficient evidence for us to conclude that remand for further proceedings would likely redress his stunted Plan progress.

---

[4] Under 49 U.S.C. § 46110(c), this court may only "affirm, amend, modify, or set aside any part of the order" but we may also "order the . . . [FAA Administrator] to conduct further proceedings."

[5] At oral argument, FAA counsel indicated that a pilot's FAA medical file includes "the entirety of his history with the FAA." Tr. Oral Arg. 22. Our remand would therefore be part of Erwin's medical file.

12

## B. Merits

Having determined that Erwin has standing, we turn to the merits. Our review of the FAA Final Order is deferential: "We may overturn nonfactual aspects of the FAA's decision only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Boca Airport, Inc. v. FAA,* 389 F.3d 185, 189 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A)). "The FAA's factual determinations are conclusive if they are supported by substantial evidence." *City of Santa Monica v. FAA*, 631 F.3d 550, 554 (D.C. Cir. 2011) (citing 49 U.S.C. § 46110(c)). We may not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Our role is to determine whether the FAA has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" that does not "fail[] to consider an important aspect of the problem," "run[] counter to the evidence" or is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* We may not, however, "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (internal quotation marks and citation omitted).

Erwin argues that we should set aside the Final Order as arbitrary and capricious because the FAA failed to explain adequately its action. Erwin points to the FAA's failure to explain "how a single positive test overcame all other documentation that supported [his] contention that he had an accidental, extraneous ethanol exposure" and highlights that the FAA did not mention "what documentation was reviewed, weighed, or assigned credibility" or why it "ignored" Sager's conclusion that Erwin's positive test was "inadvertent and secondary to his ingestion of food prepared with beer." Pet'r Br. 23–24 (citing S.A. 275). In response, the FAA argues that

"quite frankly, there [was] not much more the Federal Air Surgeon needed to say" beyond linking the positive test and the violation of the conditions of his discretionary authorization. Resp't Br. 37–38. The FAA further maintains that it need not "author an essay for the disposition of each application" and that "[i]t suffices, in the usual case, that [the court] can discern the why and wherefore." Resp't Br. 38 (second alteration in original) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999)).

Here, however, the FAA asks us to "discern the why and wherefore" for its decision based on one statement in the Federal Air Surgeon's Final Order:

> I have reviewed your agency medical file and the additional documentation you have submitted in support of your request for review of the withdrawal of your Authorization. I have determined, however, that the additional information and documentation is not sufficient to reverse the [withdrawal], and I must affirm the withdrawal of your Authorization.

J.A. 303. Granted, an exegesis may not be necessary but the FAA has not provided even one sentence demonstrating a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). It argues that it may rely solely on the positive test and Erwin's history of alcohol dependence but ignores Erwin's evidence scientifically attacking the positive test, notwithstanding the withdrawal regulations explicitly provide that a request for review "may be accompanied by supporting medical evidence." 14 C.F.R. § 67.401(i)(2). In our view, Erwin's reconsideration request and accompanying evidence, set out *supra* at 6–7**,** merits the

FAA's *explicit* consideration. Its Final Order does not do so. And the FAA is a repeat offender. As we have previously told the agency, it "cannot simply declare its 'expertise'; it must exercise that expertise and demonstrate sufficiently that it has done so else we have nothing to review much less defer to." *Village of Bensenville v. FAA*, 376 F.3d 1114, 1122 (D.C. Cir. 2004) (internal footnote omitted).[6]

The FAA acted arbitrarily and capriciously by failing to weigh the evidence provided with Erwin's reconsideration request. *See Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). Given the lack of explanation, "any analysis of the FAA's denial would be imprudent." *See*

---

[6] The FAA's handling of an earlier medical certification decision speaks volumes. *See Friedman v. FAA,* 841 F.3d 537, 544–45 (D.C. Cir. 2016) (*Friedman I*). In *Friedman I*, we rebuked the FAA for failing to provide "any rationale" to require specific diabetes data from a pilot candidate for a first-class special issuance authorization. *See id.* at 544–45. There, the FAA first attempted—unsuccessfully—to provide a rationale for requiring the data in its briefs to this court. *Id.* at 544. Here, during oral argument, the FAA again tried to provide a *post hoc* explanation for its denial by arguing that Erwin's "own forensic toxicology report that he submitted for [the FAA] to consider says that [his positive test] could be indicative of previous heavy drinking one to three days before the test" while at the same time conceding that explanation was absent from the Final Order. Tr. Oral Arg. 19–20. Granted, the FAA may on remand reach the same result after considering the non-record evidence cited in its brief, as it did successfully in *Friedman II. See Friedman v. FAA*, 890 F.3d 1092, 1097–98 (D.C. Cir. 2018) (*Friedman II*) (after remand, FAA adequately explained its data requirement by providing "its own, unequivocal medical explanation for requiring" specific data from diabetic pilot). Nonetheless, it will have then met its burden.

*Friedman I,* 841 F.3d at 545; *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) ("If the record before the agency does not support the agency action [or] if the agency has not considered all relevant factors[,] . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Instead, we remand to the FAA for it to consider the evidence Erwin provided and to make explicit the "why and wherefore" of its action. *BellSouth Corp.*, 162 F.3d at 1224.

    *So ordered.*